## Court of Appeals.

March, 1896.

## PEOPLE v. CARL FEIGENBAUM.

HOMICIDE—MOTIVE.

> Upon the trial of an indictment for murder, the question of motive is comparatively unimportant, where the other evidence points unmistakably to the guilt of the defendant.

Appeal from judgment, convicting defendant of murder in the first degree.

William S. Lawton, for appellant.

John D. Lindsay, Astt. Dist. Atty., for the People.

ANDREWS, C. J.—The defendant was convicted in the court of general sessions of the city and county of New York, of the crime of murder in the first degree in killing one Juliana Hoff, man by stabbing, on the night of Friday, August 31, 1894, in a house on Sixth street in the city of New York. A brief reference only to the facts disclosed on the trial will be sufficient to show that this court would not be justified in interfering with the verdict of the jury. The deceased, a widow fifty-six years of age, lived with her son Michael, a boy sixteen years old, in two rooms on the first floor over a store of a building on Sixth street, near Avenue A in the city of New York. The defendant is a German, who came to this country in 1890 or 1891, a gardener by occupation, having no family here, and, prior to the homicide, had drifted about in the city of New York and vicinity, occasionally getting employment, but having no steady work, and was poor, and often without means. He had lodgings from time to time, at various places, sometimes paying in part therefor, and in other cases staying for a few days at a place, and leaving without paying the sum agreed. On Wednesday, August 29th, 1894, he applied to the deceased for a room, and arranged with her that he should occupy the back room of the two rooms of her apartment for a sleeping room, he to pay therefor one dollar a week, and Mrs. Hoffman was to furnish him breakfast, for which he was to pay her eight cents for each meal. He occupied the back room on Wednesday and Thursday nights, and on Friday evening, about 10 o'clock, went to his room, which opened out of the front room, leaving the deceased and her son therein. During Friday evening, while the three were together in the front room, the deceased took from a chest in that room, which was left unlocked, a small pocketbook, and left the house to purchase some bread for her son's supper, and on her return placed the pocketbook in the closet again. After the defendant had returned to

his room, the deceased and her son went to bed, the mother sleeping on a lounge on one side of the room, near one of the two front windows, the son sleeping on a couch at the foot of, and at right angles to, the lounge. The son was the only person who was an eyewitness to anything which occurred between the defendant and the deceased prior to the homicide. He was awakened about midnight, or a little after, by a scream from his mother. He then saw the defendant standing by the side of the lounge, with a knife in his hand, facing the deceased, who had partly raised herself up on the lounge. The son kicked at him, and got out of bed, and the defendant then turned towards him with the upraised knife. The son fled to the front window furthest from the lounge, got out backward, and stood upon the cornice of the building, and cried, "Murder! Police!" He testifies that he put his head into the room, and saw the defendant strike his mother, with the knife, in the neck. His cries alarmed the neighborhood, and a policeman and other persons ran towards the house. The defendant was then seen coming out of an alley at the side of the house on Sixth street, having on a shirt or undershirt and trousers, but having no hat or shoes on, and soon commenced to run, but was pursued and overtaken by the officers, and brought back to the house and into the room the scene of the homicide. The deceased was found lying on the floor near the lounge, bleeding from an incised wound in the neck, apparently unconscious, and she died shortly after. A witness who lived in a house overlooking the alley, hearing the alarm given by the son, went to the window of her room, looking upon the rear of the house occupied by the deceased, and saw the defendant on the roof of an out-building, adjacent to the bedroom which the defendant had occupied from which he clambered down into the alley before spoken of. On searching the alley a short time after the defendant's arrest, a knife was found, from which, as was shown, the wound in the neck of the deceased might have been inflicted, with blood stains upon the blade. There was evidence, also, that there were blood stains on the hands of the defendant when he was brought into the room after his arrest. In the room occupied by the defendant was found a whetstone, such as was used in sharpening tools, and a blue cloth cover, which was suit-

able for the covering of the knife found in the alleyway. Neither of these articles had belonged to the deceased or her son. The door of the closet in the front room was found open, and the pocketbook was lying open on the shelf. There was little or no money in it the evening before, after it was replaced by the deceased on her return from the baker's; but this was not known to the defendant. There was another large pocketbook, in a trunk in the room, which contained six dollars, which had not been disturbed.

The sole defense was a denial of the identity of the defendant with the person who stabbed the deceased. The defendant was sworn as a witness in his own behalf, and his story was that a man named Weibel, with whom he had become acquainted, and who knew that he had a room in the house of the deceased, attracted his attention by a whistle after the defendant had gone to bed, and he thereupon went down and let him into the house, and that both then got into the one bed, and that the witness was awakened by a scream from the deceased, and, finding that Weibel had left the room, he got up, and, supposing that Weibel had attempted to escape by the alley, he went out on the roof and into the alley to find him, and in this way he accounts for his being in the alley, and going into the street. The improbable story of the defendant, as to which there was no corroboration, as might be supposed was not credited by the jury. It is unnecessary to go into further detail of the evidence. There can be no reasonable doubt that the defendant was guilty of the crime charged, and, except for the grave character of the case, we should have deemed it quite superfluous to call attention by an opinion to the facts which justified the conviction. The question of motive is comparatively unimportant, where the other evidence points unmistakably to the guilt of a defendant. In the present case, there could not, under the circumstances, be any evidence from a living witness (other than the defendant) of what transpired between the defendant and the deceased before the son was awakened by the screams of his mother. Whether the defendant went into the room to steal the pocketbook and was discovered by the deceased, and this led to the tragedy, is mere matter of conjecture. It is sufficient to say that the guilt of the defendant was satisfactorily proven. The

case was ably tried before an experienced and able judge. The few exceptions taken raise no serious question, and none have been relied upon by the counsel for the defendant. The charge was clear, careful and impartial, and it becomes our duty to affirm the conviction. The judgment should be affirmed.

All concur.

Judgment affirmed.