## PORTER *v.* THE STATE OF INDIANA.

[No. 21,328.    Filed March 29, 1910.]

1.  INDICTMENT AND INFORMATION.—*Charging that Decedent Was a Human Being.*—*Homicide.*—An indictment charging that defendant, at a certain time and place, feloniously, purposely and with premeditated malice killed and murdered Mary A. Porter, sufficiently shows that a human being was killed.  p. 700.
2.  CRIMINAL LAW.—*Right of Defendant to Inspection of Evidence Before Grand Jury.*—The defendant in a criminal case has no legal right to an inspection of the evidence given by himself before the grand jury.  p. 700.
3.  HOMICIDE.—*Evidence.*—*Declarations.*—*Husband's Illicit Relations with Other Women.*—*Motive.*—In a prosecution against a husband for the murder of his wife, evidence of declarations of the husband, made two years prior to the alleged murder, of his illicit relations with other women is admissible as tending to show a motive for the alleged murder.  p. 700.
4.  HOMICIDE.—*Instructions.*—*Limiting Application of Evidence.*—*Duty of Judge.*—In a prosecution against a husband for the murder of his wife, evidence of the husband's declarations of illicit relations with other women having been admitted over his objection, it is the duty of the judge, without a request from defendant, to instruct that such evidence can be considered only on the question of motive.  p. 702.

5. HOMICIDE.—*Evidence.*—*Illicit Relations.*—*Motive.*—*Instructions.* —*Limiting Consideration of Evidence.*—In a prosecution of a husband for the murder of his wife evidence of the relations of the husband with a domestic is admissible as tending to show a motive, but the judge should instruct the jury that such evidence should be considered only for such purpose. p. 703.

6. HOMICIDE.—*Evidence.*—*Defendant's Declarations of His General Immorality.*—*Presumption of Prejudice.*—In a prosecution for homicide, evidence of defendant's declarations that he was "ornery," and that there was nothing too "low down for him to do," are not admissible, the admission thereof presumably being prejudicial to defendant. p. 703.

7. HOMICIDE.— *Instructions.*— *Motive.*— *Consideration of.*— In a prosecution of a husband for the murder of his wife, there being evidence introduced by defendant that the killing was accidental and that his relations with his wife were pleasant, a refusal to give his requested instruction that if the evidence failed to show any motive for the alleged crime, such fact would be a circumstance which the jury should consider in determining its verdict, is erroneous, there being no other instruction presenting such matter. p. 704.

From Jay Circuit Court; *John F. LaFollette,* Judge.

Prosecution by The State of Indiana against Ira W. Porter. From a judgment of conviction, defendant appeals. *Reversed.*

*John W. Newton, Emerson McGriff* and *Smith & Moran,* for appellant.

*James Bingham,* Attorney-General, *A. G. Cavins, E. M. White* and *W. H. Thompson,* for the State.

JORDAN, J.—Appellant was charged by an indictment re-returned by the grand jury of Randolph county, Indiana, with having at said county and State, on January 15, 1908, feloniously, purposely and with premeditated malice, killed and murdered Mary A. Porter, by shooting her with a certain deadly weapon called a "shotgun," etc.

Upon arraignment appellant entered a plea of not guilty. The cause was venued to the Jay Circuit Court, and upon a trial by jury in the latter court a verdict was returned finding him guilty of murder in the second degree, and as-

sessing his punishment at imprisonment in the state prison during life.  Over appellant's motion for a new trial, judgment was rendered upon the verdict.

From this judgment he appeals, and assigns as errors of the lower court:  (1) Overruling his motion to quash the indictment.  (2) Overruling his motion for a new trial. (3) Denying his petition for an inspection of his testimony given by him before the grand jury, which returned the indictment.

The facts in this case disclose that Mary A. Porter, the decedent, was the wife of appellant, and that they had lived together in Randolph county on a farm as husband and wife since 1870, and were the parents of several children.

The conviction of appellant rests in the main upon circumstantial evidence, he being the only living eyewitness to the alleged homicide.  The theory of his defense, as advanced by his counsel, is that the killing of his wife was purely the result of the accidental discharge of one of the barrels of a double-barrel shotgun which she at the time was carrying out of the house.  His counsel claim that the evidence discloses that at the time the fatal shot was fired, appellant was 200 feet away from the point where his wife was killed; that he was out in the barn lot, and while there he saw a chicken hawk and called to his wife, who was at the time at the pump just east of their dwelling-house and only a few feet from the door, to bring him his shotgun, that he might shoot the hawk; that his wife, in response to the request, went into the house to procure the gun, and as she was about to pass out through the door with the gun in her hands, its hammers in some manner caught upon the door, or something else, and by this means the hammer of the right barrel exploded the discharge which killed the decedent; that the hammer of the left barrel was weak in the spring, and did not strike the cartridge with sufficient force to explode it.

Appellant at the trial testified in his own behalf.  He

stated that he was sixty-eight years old; that he had lived in Randolph county, Indiana, all of his life, except two years in Blackford county and two years in Jay county; that he was married to the decedent in 1870; that he had served during the war of 1861 in Company F, Third Ohio Cavalry; that he owned eighty acres of real estate in Jackson township, Randolph county. The version which he gave in regard to the manner in which his wife was killed was briefly as follows: He testified that on January 15, 1908, his wife lost her life; that on the morning of that day he asked her for a small hammer which was about the house, as he desired to do some repairing; that she could not find the hammer, and he went out to the barn to get a large hammer; that while he was about the barn he saw a chicken hawk sitting on the fence on the east side of the hog yard, east of the barn. He testified: "I went to the door of the barn and saw my wife standing on the well platform. I hollered to her and said, 'Mollie, fetch me the gun, quick, and I will kill that big hawk.' She said 'All right,' and whirled around and went into the house. I started to meet her at the gate. I was, I think, about fifteen feet southeast of the gate, south of the woodpile. I saw Mollie coming. She had the gun in her left hand, and just as the gun was discharged she just reeled around and sunk right down with her back against the door casing. I said: 'O, Mollie! O, Mollie!' and run up to her. Was just about to pick her up, and I saw her brains laying down on the little platform out of the door. I saw that it was a death wound, and began to call out: 'O, Dell! O, Dell!' to my nearest neighbor, Mr. Jessup. I turned around the northeast corner of the house, and went around to the gate out of the yard, down the lane. I called just as quick as I saw the brains laying there."

A. L. Jessup, the man whom appellant called "Dell," at the time his wife was killed, resided on a farm immediately north of and adjoining appellant's farm. This witness testified that on January 15, 1908, he and his wife and his

brother were in the house, that about 9 o'clock in the morning he heard Porter calling his name and crying out. He testified: ''Porter came up the lane toward my house, hollering 'Dell, O, Dell! Oh, my God, Mollie shot herself.' '' The witness came out and answered Porter. This witness stated that Porter ran down the lane, and he and his wife followed him, and went into Porter's house at the east door, and saw brains on the doorstep. Saw nothing on the floor except blood and brains and pieces of skull scattered around the floor. He said to appellant: ''This is bad,'' and appellant replied: ''Yes, this is bad.'' He testified further: ''I said to him: 'How did this happen, Ira?' 'Well,' he said: 'I was out looking for a big hammer, I wanted to fix my dog-kennel.' He said: 'I was out to the east of the barn—horse barn; was looking for a hammer, and when I was in the barn I looked out east of the barn and saw a chicken hawk.' He said he started out of the west door and saw his wife, Mollie, on the well platform, and hollered for her to bring the gun; he wanted to kill that chicken hawk. Said he got down and started to meet her as she came out with the gun, and when he got there by the woodpile he heard the gun go off, looked up and saw her sinking. He said: 'I think she was turning around.' He said 'I don't know whether she was falling, or whether she stumbled, or how she done it.' Said he saw what was done and began hollering.''

Mrs. Jessup, wife of A. L. Jessup, commonly called ''Dell'' corroborated the testimony of her husband. She said that when she heard the report of the gun she and her husband were sitting by a stove in the same room, and that when she heard the report that she glanced out of the window, down towards the Porter house, and that she heard Porter holloing, and that she jumped up and ran to the door. It was almost immediately after the report of the gun when she heard the holloing. She went to the door and looked out and her husband ran to the door and answered Porter. She

saw Porter in the lane at the northwest corner of the yard; he was crying, saying: "My God, Mollie has shot herself." He said this over and over. Her husband got his coat and ran down the road. Mrs. Jessup testified that a week or so before the death of Mrs. Porter she told her that hawks were killing her chickens.

The State introduced evidence showing that appellant and his wife did not live altogether harmoniously; that at times there was trouble between them; that at one time trouble and ill-feeling was engendered in regard to a certain girl, who was a domestic in the family. Appellant's wife discharged this girl for the reason, as she claimed, that on one occasion on entering the room at their home she discovered the girl and appellant in what is termed to have been "a compromising attitude." The subject of appellant's attention to the girl in question continued to be a matter of discord up to the time of the death of the wife. This evidence, the State claims, tends to show a motive for appellant to rid himself of his wife; that it disclosed that ill-feeling existed between the parties, and that their domestic relations were strained. On the other hand, there is evidence to show that the relations between appellant and his wife were friendly and good; that he regarded her as the best woman he had ever seen.

The evidence is voluminous, and as to the sufficiency thereof to sustain the verdict of the jury we express no opinion. The meager statement which we have made in respect to the evidence is only for the purpose of showing the character of the case which appellant's counsel assert, "to say the least, is enveloped in mystery," and more fully to present the question as to whether appellant was prejudiced by certain rulings of the court of which he complains.

Counsel for appellant argue numerous questions, upon which they rely for reversal, among which we mention: (1) The insufficiency of the indictment. (2) Error of the court in denying appellant's application for an inspection of his

own evidence, which he gave to the grand jury that returned the indictment. (3) Admission of certain evidence on behalf of the State. (4) Giving and refusing to give certain instructions to the jury. (5) Insufficiency of the evidence, etc.

1. The objection urged to the indictment is that it does not aver or show that Mary A. Porter, the person killed, and murdered, was a human being. This objection is devoid of merit. *Merrick* v. *State* (1878), 63 Ind. 327.

2. The court did not err in refusing appellant's application to be furnished a copy of his own testimony given to the grand jury. There is nothing to show that such testimony was in any manner material to him in preparing for or conducting his defense. As a matter of right, under the law, he was not entitled to have an inspection of the evidence in question. *Thrawley* v. *State* (1899), 153 Ind. 375; *Merrick* v. *State, supra.*

3. In introducing its evidence-in-chief, the State, over the objection and exception of the defendant, was permitted to prove by A. L. Jessup, a witness, a conversation which he had with defendant about two years before the homicide. On the occasion in question, this witness testified that the defendant came over to the field in which he (Jessup) was plowing corn; that the father of Jessup was present at the time; that, after having some conversation with the defendant about a watch and some other matters, "one word brought on another," and finally in this conversation the witness's father said to the defendant: "Ira, there has always been a query in my mind whether you were guilty of the other charge"—meaning thereby a charge of assault and battery to commit a rape, for which appellant had been prosecuted some seventeen years before. In response to this the defendant said: "No, I was not. I did not have to go to extreme means to accomplish my end with that girl." In the same conversation the witness testified that appellant said that "the reason he had never been

able to work was that at one time he had run seven different women.''

The State also in its introduction of the evidence-in-chief was permitted by the court to prove by Frank Brown, a witness, that in a certain conversation which he had with the defendant about two years before, in which they were talking about church affairs, the defendant said that he ''once belonged to church, but now he was as ornery as h—l.'' The witness further testified that on another occasion, in. a conversation which he had with the defendant, that the latter said that once he was a saved man, ''but now there was not anything too G—d d—d low down for him to do.''

Appellant's counsel argue with much earnestness that the trial court erred in permitting the witness Jessup to testify to what appellant said in conversations, namely, ''that he did not have to go to extremes to accomplish his end with that girl,'' etc., and that the reason he had not been able to work was that ''at one time he had run seven different women.''

In respect to what was said by appellant in the conversation which he had with Brown, counsel insist that this evidence was not competent for any purpose. It is argued that the evidence given by the witnesses Jessup and Brown, in regard to what appellant said in their presence, could serve only to convey to the jurors and impress upon their minds that appellant was a lustful, licentious and depraved man, and that the evidence greatly degraded him in the eyes of the jurors and created a prejudice against him.

It must be remembered, however, that the evidence upon which the State relies for conviction is wholly circumstantial; and while it was not indispensable, in order to convict appellant of the crime charged, to prove that he had a particular motive for taking the life of his wife, nevertheless, if the State by evidence could establish such a motive, it certainly would be a circumstance to be considered by the jury

in connection with all of the other evidence to determine the guilt of the accused.

In respect to the testimony given by Mr. Jessup as to what appellant said in the conversation in question, we are of the opinion that it was competent to be introduced by the State as tending to show illicit relations upon the part of appellant with other women during his married life. The evidence would at least tend to show lack of affection and regard upon his part for his wife and disregard of his conjugal relations. All of which were matters which the State, in a case of this character, might prove for the purpose of showing the presence of a motive on the part of appellant to be rid of his wife. For this purpose, and for this purpose alone, evidence tending to show appellant's love for and illicit relations with other women during the time he and the decedent were living together as husband and wife was competent to be introduced by the State. *Pettit* v. *State* (1893), 135 Ind. 393; *Hinshaw* v. *State* (1897), 147 Ind. 334; *State* v. *Callaway* (1900), 154 Mo. 91, 55 S. W. 444; *Rains* v. *State* (1889), 88 Ala. 91, 99, 7 South. 315; *Johnson* v. *State* (1850), 17 Ala. 618; *Duncan* v. *State* (1889), 88 Ala. 31, 7 South. 104; *Brunson* v. *State* (1899), 124 Ala. 37, 27 South. 410; *Kennedy* v. *People* (1868), 39 N. Y. 245; *Son* v. *Territory* (1897), 5 Okla. 526, 49 Pac. 923; *Pointer* v. *United States* (1894), 151 U. S. 396, 14 Sup. Ct. 410, 38 L. Ed. 208; *Boyle* v. *State* (1884), 61 Wis. 440, 21 N. W. 289; *State* v. *Rathbun* (1902), 74 Conn. 524, 51 Atl. 540; 1 Wigmore, Evidence, §118; Underhill, Crim. Ev., §323; 6 Ency. Ev., 719, 720.

The evidence as hereinbefore set out, given by the witness Jessup, being admissible only for the purpose of showing a motive on the part of appellant, the court, therefore, 4. in its charge to the jurors should have advised them that in their consideration of this evidence they should limit it to that question alone. Appellant, having objected to its admission and assumed the attitude that it

was wholly incompetent for any purpose, could not be expected to request the court to charge the jury for what purpose the evidence should be regarded or considered.

Appellant's counsel earnestly contend that the court erred in permitting the State to introduce evidence relative to relations existing between appellant and the domestic who resided in his family. This evidence tended to show improper or questionable relations between him and this girl, which appear to have created strained relations between him and his wife, and it also tended to show lack of love and affection upon his part for his wife. The evidence was competent. See authorities hereinbefore cited. But the court, in its charge to the jury, should have limited the jury in the consideration thereof to the purpose for which it was introduced.

Appellant's counsel contend that the trial court erred in admitting on behalf of the State the testimony of the witness Frank Brown, which we have hereinbefore set out, in regard to what appellant said in a conversation with the witness, that he (appellant) was "ornery," etc., and that there was nothing "too * * * low down for him to do." In this contention of counsel we concur. For aught appearing to the contrary, the jury may have regarded or considered these admissions by appellant as disclosing that he was so devoid of morality, and of such a dissolute character that he was capable of committing the crime of murdering his wife. In the case of *Dunn* v. *State* (1904), 162 Ind. 174, the court said: "The law will not permit the State to depart from the issue, and introduce evidence of other extraneous offenses of misconduct that have no natural connection with the pending charge, and which are calculated to prejudice the accused in his defense." Upon no view or theory, under the circumstances, can the evidence in question be said to be proper or pertinent, and as the court erred in its admission, we must presume that it operated to the prejudice or harm of appellant,

unless the record shows to the contrary, which it does not. *Cleveland, etc., R. Co.* v. *Case* (1910), 174 Ind. ——, 91 N. E. 238.

The theory advanced upon the trial by appellant's counsel, and the one which they seek to maintain in this appeal, is that the death of the decedent resulted from the accidental discharge of the shotgun, as testified by appellant upon the trial. As previously stated, there was evidence given in his behalf to show that the relations between him and his wife had always been amicable and good, and that he held her in high regard. His counsel claim that this evidence disclosed that there was an entire absence of any motive upon his part for murdering his wife.

7.

The charge of the court to the jury upon the question of motive was quite general. It merely stated that "motive and purpose, like malice and criminal intent, as a rule, can only be inferentially proved. * * * Proof of a motive to commit the crime is not indispensable, nor is it essential to a conviction. While motive may be shown as a circumstance to aid in fixing the crime on the defendant, yet the State is not required to prove a motive upon the part of the defendant in order to convict, but the jury would be justified in inferring the motive if the commission of the crime by the defendant is proved beyond a reasonable doubt, as required by the law."

At the proper time appellant tendered to the court, with a request that it be given, an instruction that if the jury found upon a careful examination of all the evidence that it failed to show any motive on the part of the accused to commit the crime charged against him, "then this is a circumstance which the jury ought to consider in making up its verdict." This charge the court, over the exception of the appellant, refused to give. No other instruction upon the question of motive was given, except the general one to which we have referred, which wholly failed to present to the jury

appellant's theory upon the evidence in the case in respect to a lack of motive upon his part for killing his wife.

In cases of the character of this one, which depend for conviction wholly upon circumstantial evidence, the absence of any motive upon the part of the accused party for committing the crime charged against him is a circumstance to be considered by the jury in his favor, and the jury may give it such weight as it may consider proper. This principle is well settled and affirmed by the authorities. *Kennedy* v. *People, supra; Son* v. *Territory, supra; Pointer* v. *United States, supra; State* v. *Rathbun, supra; Clough* v. *State* (1878), 7 Neb. 320; 1 Wigmore, Evidence, §118; Burrell, Circumstantial Ev., 314.

The fact in this case, that the person alleged to have been murdered was the wife of appellant, presents a case outside of the ordinary. Therefore, under the circumstantial evidence upon the trial, the question would naturally arise, What motive, if any, prompted or induced appellant to commit the horrible crime of killing his wife? As well said by Chief Justice Hosmer in *State* v. *Watkins* (1831), 9 Conn. *47, *52: ''The deceased was the wife of the prisoner. The presumption thence arising, that she was not killed by her husband, or that it was not of malice aforethought, was powerful. The relation of husband and wife, clearly implies a strong partiality, on the part of the husband, towards his wife, and the most ardent desire to protect her, and to render her happy. As a man will consult his own preservation and pursue his own interest; so, as a general truth, he will equally regard the protection and interest of his wife.''

It is manifest, therefore, in this case that the existence or nonexistence of motive on the part of appellant to commit the crime charged was a question under the evidence to be considered by the jury—the former in favor of the State and the latter in favor of the accused. There being evidence to support the theory advanced by appellant, that

there was an absence of motive, he was entitled to have the jury advised by proper instructions upon the law applicable to his theory. *Banks* v. *State* (1901), 157 Ind. 190; *Diehl* v. *State* (1901), 157 Ind. 549; *Eby* v. *State* (1905), 165 Ind. 112; *Brunaugh* v. *State* (1910), *ante*, 483.

It follows, and we so conclude, that the court committed an error in refusing to charge, as requested by appellant, in respect to an absence or a lack of motive on his part for committing the crime in controversy.

For the errors in admitting evidence as herein pointed out and in refusing the instruction requested, the judgment is reversed and a new trial ordered.

Monks, J., did not participate in this decision.